UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | MEMORANDUM & ORDER |
| -against- | 18-CR-455 (NGG) |
| JUAN FERNANDEZ-TAVERAS, | |
| Defendant. | |

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Juan Fernandez-Taveras, an immigrant from the Dominican Republic, pleaded guilty to criminal possession of a controlled substance in the second degree, in violation of N.Y. Penal Law § 220.18, in August 1998. He was sentenced to a prison term of three years to life and subsequently deported in July 2000. At some point, Mr. Fernandez-Taveras reentered the United States and in May 2018, he was arrested and charged with narcotics offenses in Queens, NY. A federal grand jury then indicted him on one count of illegal reentry into the United States, in violation of 8 U.S.C. §§ 1326(a) and (b)(1). (*Id.*)

Mr. Fernandez-Taveras now moves under Federal Rule of Criminal Procedure 12 to dismiss the indictment via a collateral attack against his original removal order or, in the alternative, for an evidentiary hearing. (*See* Def. Mem. in Supp. of Mot. to Dismiss ("Mem.") (Dkt. 18-1); Gov't Mem. in Opp. to Mot. to Dismiss ("Opp.") (Dkt. 21); Def. Reply ("Reply") (Dkt. 25).) He argues that, applying the appropriate categorical analysis, the New York possession statute to which he pleaded guilty is not a deportable offense because it criminalizes possession of a wider swath of substances than the Controlled Substances Act ("CSA"), which

1

serves as the predicate for 8 U.S.C. § 1227(a)(2)(B)(i), under which he was deported.[1] (*See* Mem. at 10-15.)

For the following reasons, Mr. Fernandez-Taveras's Motion is GRANTED and the Indictment is DISMISSED.

## I. BACKGROUND

Mr. Fernandez-Taveras entered the United States in 1989. (*See* Decl. of S. Isaac Wheeler ("Wheeler Decl.") (Dkt. 18-2) ¶ 4.) He acquired lawful permanent resident status in June 1996 because he married an American citizen, with whom he has three children. (*See* Mem. at 2.) In August 1998, Mr. Fernandez-Taveras pleaded guilty to criminal possession of a controlled substance in the second degree, in violation of N.Y. Penal Law § 220.18, after police found more than four ounces of cocaine in his residence along with drug paraphernalia. (*See id.*; Criminal Compl. of Feb. 22, 1998 (Dkt. 21-1).) He was sentenced to a term of three years to life. (*See* Certificate of Disposition Indictment (Dkt. 18-7).)

On May 14, 1999, while incarcerated at Lakeview Correctional Facility, Mr. Fernandez-Taveras received a Notice to Appear ("NTA") from the Immigration and Naturalization Service ("INS"). (*See* NTA (Dkt. 18-8).) The NTA stated that due to Mr. Fernandez-Taveras's state conviction for cocaine possession, he

---

[1] Mr. Fernandez-Taveras also argues that the Notice to Appear charging document that commenced his removal proceedings was facially insufficient because it did not include the time and date for the initial hearing in immigration court. Absent a valid charging document, he argues that the immigration court lacked jurisdiction to order his removal, and therefore that the removal order entered is void *ab initio*. However, as he concedes, the Second Circuit rejected that argument in *Banegas-Gomez v. Barr*, 922 F.3d 101 (2d Cir. 2019). (*See* Mem. at 22.) In light of that precedent, the court declines to address the facial sufficiency argument.

was deportable under Section 237(a)(2)(B)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(2)(B)(i), which provides that:

> Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.

8 U.S.C. § 1227(a)(2)(B)(i). The NTA ordered Mr. Fernandez-Taveras to appear before an immigration judge ("IJ"), "date, time and place to be set." (*See* NTA at 1.) An accompanying letter stated that the "date of [his] removal proceeding is subject to the availability of Immigration and Naturalization Service personnel." (*See id*. at 4.)

The first hearing was to be held before IJ Joe Miller on July 27, 1999 but the state Department of Corrections ("DOCCS") failed to produce Mr. Fernandez-Taveras. (*See* Record of Dep't of Justice Executive Office for Immigration Review ("DOJ-EOIR") Database (Dkt. 18-10) at ECF p. 3.) On September 9, 1999, Mr. Fernandez-Taveras appeared via videoconference but the court adjourned the proceedings to allow him to secure counsel. (*See* Mem. at 4-5.) On September 21, 1999, he was paroled from DOCCS into INS custody. (*See* DOJ-EOIR Mot. of Sept. 29, 1999 (Dkt. 18-9) at ECF p. 5.)

On November 9, 1999, Mr. Fernandez-Taveras appeared with his attorney, Stephen Tills, before IJ John Reid. (Mem. at 6.)[2] After

---

[2] The Defense has provided the court with audio recordings of hearings in Mr. Fernandez-Taveras's removal proceeding which were produced by the Government in discovery. (*See* Wheeler Decl. ¶ 13.) For ease of reference,

two continuances, he appeared again on December 7, 1999, at which time Mr. Tills requested another continuance and IJ Reid became upset that he was not prepared to conduct the hearing. (*Id.*) Mr. Tills stated that he was still trying to obtain information about the voluntariness of Mr. Fernandez-Taveras's guilty plea. (*Id.*) IJ Reid responded that a constitutional collateral attack on the underlying conviction was not relevant to removability and required Mr. Tills to go forward. (*Id.* at 6-7.) At that point, Mr. Tills conceded that Mr. Fernandez-Taveras was removable because he was convicted of a state violation relating to a controlled substance within the meaning of the CSA. (*Id.* at 7.) Mr. Tills then sought a voluntary departure, which would have allowed Mr. Fernandez-Taveras to leave the United States of his own accord. (*Id.*) IJ Reid set a hearing date for January 5, 2000 to consider the request. (*Id.*)

On January 5, 2000, Mr. Fernandez-Taveras appeared with Mr. Tills but stated that he was retaining a new attorney. (*Id.*) The court adjourned until February 14, 2000, at which point Mr. Fernandez-Taveras was represented by Carlos Perez-Olivo. Mr. Perez-Olivo appeared telephonically and informed the court that he was in the process of obtaining the case file from Russell Carbone, whom Mr. Fernandez-Taveras had originally retained to replace Mr. Tills but who had withdrawn because he was suspended from the practice of law following a federal conviction. (*Id.*) The court reconvened on March 20, 2000, but Mr. Perez-Olivo was unable to attend in person because he experienced a sudden onset of vertigo while on his way to the hearing and instead appeared telephonically. (*Id.* at 8.) At the hearing, IJ Reid held that Mr. Fernandez-Taveras was removable based on his conviction—as his previous attorney had conceded—and denied

---

the court cites to Defendant's Mem. for descriptions and timestamps in the audio exhibits.

his request for voluntary departure. (*Id.*) Mr. Perez-Olivo reserved the right to appeal to the Board of Immigration Appeals ("BIA") but no appeal was filed. Mr. Fernandez-Taveras was removed to the Dominican Republic on a commercial flight on July 11, 2000. (*See* Deportation Order (Dkt. 18-13).)

On May 23, 2018, Mr. Fernandez-Taveras was arrested in Queens and charged with narcotics offenses. (*See* Indictment (Dkt. 1).) A federal grand jury indicted him on one count of illegal reentry into the United States, in violation of 8 U.S.C. §§ 1326(a) and (b)(1). (*Id.*)

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 12 "authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds." *United States v. Ahmed*, 94 F. Supp. 3d 394, 404 (E.D.N.Y. 2015).[3] In *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987), the Supreme Court held that a person charged with illegal reentry must have an avenue to subject the underlying deportation order to judicial review. Congress codified the holding of *Mendoza-Lopez* in 8 U.S.C. § 1326(d). *See United States v. Lopez*, 445 F.3d 90, 94 (2d Cir. 2006). To successfully challenge an illegal reentry via a collateral attack on the underlying deportation order, an immigrant must demonstrate that:

---

[3] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted and all alterations are adopted.

1) he exhausted any administrative remedies that may have been available to seek relief against the order;
2) the deportation proceedings at which the order was issued improperly deprived him of the opportunity for judicial review; and
3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d). When all three conditions of Section 1326(d) are met and the deportation order is defective, the court must dismiss an indictment for illegal reentry predicated upon the defective deportation order. *See United States v. Copeland*, 376 F.3d 61, 66 (2d Cir. 2004).

### III. DISCUSSION

#### A. Administrative Exhaustion and Deprivation of Judicial Review

Mr. Fernandez-Taveras had the right to appeal the Immigration Judge's decision to the BIA and to move for reconsideration in the immigration court, but he did neither. Similarly, had Mr. Fernandez-Taveras received an adverse decision from the BIA, he could have appealed to the Second Circuit or sought habeas review, but he did not. Thus, Mr. Fernandez-Taveras failed to exhaust his administrative remedies or to seek judicial review available to him. However, applying the Second Circuit's reasoning in *United States v. Calderon*, 391 F.3d 370 (2d Cir. 2004), and *United States v. Sosa*, 387 F.3d 131 (2d Cir. 2004), the court excuses that failure as the result of a legally erroneous concession by Mr. Fernandez-Taveras's counsel, accepted by the immigration court.

In *Calderon*, an IJ told the defendant, who was represented by counsel, that he was ineligible for relief under Section 212(c) of the INA, which allowed for a waiver from deportation under certain conditions. *Calderon*, 391 F.3d at 372. At the time, the IJ's interpretation was correct under legal authority that was binding

6

on the court. *Id.* at 373. Mr. Calderon did not pursue an appeal because his lawyer informed him that the IJ's finding was based on a binding interpretation of the statute, that an appeal to the BIA would be futile, and that the only avenue for relief was a habeas petition which would be expensive and would require him to stay in custody during the pendency of litigation. *Id.* Then, a year after Mr. Calderon's appearance before the IJ, the Supreme Court corrected that "then-prevalent misinterpretation" of the INA in *INS v. St. Cyr*, 533 U.S. 289, 326 (2001). *Id.* Mr. Calderon was removed and was subsequently arrested and charged with illegal reentry when he attempted to return to the United States. *Id.* The district court dismissed the indictment. *See United States v. Calderon*, No. 02-cr-691 (JBW), 2003 WL 1338943, at *7 (E.D.N.Y. Jan. 9, 2003). On appeal, the Second Circuit held that "[a]lthough Calderon chose not to exhaust all available administrative remedies, his choice was not knowing and intelligent," and was therefore excused. *Calderon*, 391 F.3d at 374. Mr. Calderon's choice was not knowing and intelligent because "[n]ot only was [he] not informed that he had an opportunity to apply for section 212(c) relief, he was explicitly told by the IJ and his counsel that he was barred from doing so." *Id.* at 375. Similarly, in *Sosa*, the Second Circuit excused a pro se defendant's failure to exhaust his remedies when the IJ had said that relief under Section 212(c) was not available to him—the same erroneous advice as in *Calderon*. *Sosa*, 387 F.3d at 137. Both the *Calderon* and *Sosa* courts noted that the defendants in *Mendoza-Lopez*—the case that launched collateral review of removal orders in illegal reentry cases and upon which Section 1326(d) was based—failed to exhaust their administrative remedies. *See Calderon*, 391 F.3d at 375 (quoting *Sosa*, 387 F.3d at 137).

Mr. Fernandez-Taveras is in an analogous position to the defendants in *Calderon* and *Sosa*. His attorney conceded, and the IJ agreed, that a conviction under N.Y. Penal Law § 220.18 made

7

him deportable under 8 U.S.C. § 1227(a)(2)(B)(i), but he argues that as a matter of statutory interpretation that conclusion was incorrect. The Government makes much of the fact that Mr. Fernandez-Taveras explicitly reserved the right to appeal to the BIA and then failed to. That argument cannot be squared with *Calderon*, where the defendant chose not to appeal because his lawyer told him that it was futile. *See Calderon*, 391 F.3d at 373. Where a defendant fails to exhaust his remedies or to seek judicial review based on counsel and the court's incorrect statements of law, that failure is excused. *Id.* Accordingly, the court moves to Section 1326(d)(3), to consider whether Mr. Fernandez-Taveras's removal was "fundamentally unfair."

### B. Fundamental Unfairness

A deportation based on a state conviction that does not meet the federal standard for deportability is fundamentally unfair, in violation of Section 1326(d)(3). *See, e.g., United States v. Montcrieffe*, 167 F. Supp. 3d 383, 414 (E.D.N.Y. 2016); *United States v. Aguilera-Rios*, 769 F.3d 626, 637 (9th Cir. 2014). Mr. Fernandez-Taveras pleaded guilty to N.Y. Penal Law § 220.18 for cocaine possession. He was deported pursuant to 8 U.S.C. § 1227(a)(2)(B)(i), because his conviction was allegedly "relating to a controlled substance (as defined in section 802 of Title 21)." To determine whether a conviction under a state statute is a removable offense under federal law, the court employs a categorical approach. *See Mellouli v. Lynch*, 135 S. Ct. 1980, 1986 (2015). "An alien's actual conduct is irrelevant to the inquiry, as the adjudicator must presume that the conviction rested upon nothing more than the least of the acts criminalized under the state statute."[4] *Id.*

---

[4] When a statute is divisible, the court applies a modified categorical approach that "permits consideration of certain materials that reveal which

The issue at bar is whether the New York statute criminalizes certain cocaine isomers that the CSA, 21 U.S.C. § 802, does not. "Isomers are molecules that share the same chemical formula but have their atoms connected differently, or arranged differently in space." *United States v. Phifer*, 909 F.3d 372, 376 (11th Cir. 2018).

At the time of conviction (and now,) N.Y. Penal Law § 220.18(1) provided that a "person is guilty of criminal possession of a controlled substance in the second degree when he or she knowingly and unlawfully possesses . . . one or more preparations, compounds, mixtures or substances containing a narcotic drug and said preparations, compounds, mixtures or substances are of an aggregate weight of two ounces or more." Cocaine is a "narcotic drug" defined under New York law as:

> Coca leaves and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances including cocaine and ecgonine, their salts, isomers, and salts of isomers, except that the substances shall not include decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine.

N.Y. Pub. Health L. § 3306, sch. II (b)(4) (McKinney 1998). The Public Health Law's definition of cocaine was adopted in 1978. (*See* Bill Jacket, L. 1978, ch. 100 ("Bill Jacket") (Dkt. 18-14).) According to the Sponsor's Memorandum in support of that bill, "[t]he question of whether [dextro isomer cocaine and levo isomer cocaine] are chemically equivalent is the source of the

---

of a statute's separate offenses served as the basis for the defendant's conviction." *Harbin v. Sessions*, 860 F.3d 58, 64 (2d Cir. 2017). Here, Mr. Fernandez-Taveras's conviction for cocaine possession fell under Section 220.18(1) and the categorical analysis applies to that subsection. The definition of cocaine under New York law is not a divisible statute amenable to a modified categorical approach.

present controversy" and the bill's purpose was to address "the difficulty in distinguishing between isomers of cocaine." (Bill Jacket at ECF p. 6.) To remedy that problem, the Legislature intended to close "the statutory loophole . . . by enacting this amendment which would include *all isomers of cocaine* and ecgonine in the schedule of controlled substances." (*Id.*) (emphasis added). *See also People v. Burnett*, 245 A.D.2d 460 (2d Dep't 1997) ("[A] controlled substance under Schedule II of Public Health Law § 3306 includes cocaine and all of its isomers. Hence, upon the forensic chemist's conclusion that cocaine was present in the substance tested, there was no need for additional testing to ascertain whether the substance was L-cocaine or D-cocaine.")

Meanwhile, the federal definition of cocaine under the CSA at the time of conviction included:

> Coca leaves and any salt, compound, derivative or preparation of coca leaves (including cocaine and ecgonine and their salts, isomers, derivatives and salts of isomers and derivatives), and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine.

21 C.F.R. § 1308.12(b)(4). According to the definition of "isomer" under the CSA, as used in Section 1308.12(b)(4), covering cocaine, "the term 'isomer' means any optical or geometric isomer." 21 C.F.R. § 1300.01(b). In addition to optical and geometric isomers, there are also "positional" isomers, which are not included in the definition of cocaine. *Phifer*, 909 F.3d at 378. In contrast, in the subsection of the CSA's definitions covering hallucinogenic drugs, "'isomers' means any optical, positional, or geometric isomer." 21 C.F.R. § 1300.01(b)

10

Thus, the federal scheme excludes positional isomers from its definition of cocaine but includes them in its definition of hallucinogens. The New York Legislature made a different policy choice to define cocaine as broadly as possible, including all isomers. The Legislature implemented that policy for two reasons: (1) to ease the financial burden on police laboratories that would need to purchase expensive equipment to differentiate between different isomers of cocaine; and (2) to avoid risk that any legalized form of cocaine might pose to the public. (*See* Bill Jacket at ECF p. 6.) As a result of the difference in the definitions of cocaine under New York law and federal law, possession of certain cocaine isomers is illegal under the New York statute but legal under the CSA.

The Government does not contest that the New York and federal statutes fail a traditional categorical analysis. Instead, it argues that under *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007), a defendant must show "a realistic probability, not a theoretical possibility," that the state and federal statutes could diverge in practice. But the Second Circuit has stated conclusively that the "realistic probability" test does not apply "when the statutory language itself, rather than the application of legal imagination to that language, creates the realistic probability that a state would apply the statute to conduct beyond the generic definition." *Hylton v. Sessions*, 897 F.3d 57, 63 (2d Cir. 2018) (quoting *Ramos v. U.S. Att'y Gen.*, 709 F.3d 1066, 1072 (11th Cir. 2013); and citing *Singh v. Att'y Gen.*, 839 F.3d 273, 286 n.10 (3d Cir. 2016) ("Here, the elements of the crime of conviction are not the same as the elements of the generic federal offense. The Supreme Court has never conducted a 'realistic probability' inquiry in such a case."); *Chavez-Solis v. Lynch*, 803 F.3d 1004, 1010 (9th Cir. 2015) ("[W]hen a state statute's greater breadth is evident from its text, a petitioner need not point to an actual case applying the statute of conviction in a non-generic manner."); *Swaby v. Yates*, 847 F.3d 62, 66 & n.2 (1st Cir. 2017) (rejecting the Government's

"surprising view that, in applying the categorical approach, state law crimes should not be given their plain meaning").) The Second Circuit recently reiterated the holding of *Hylton*, that the "realistic probability" test has no place where the plain text of the statutes at issue does not match. *See Williams v. Barr*, 960 F.3d 68, 78 (2d Cir. 2020) ("The 'realistic probability' test articulated in *Duanes-Alvarez* has no role to play in the categorical analysis . . . when the state statute of conviction on its face reaches beyond the federal definition."); *Jack v. Barr*, 966 F.3d 95, 98 (2d Cir. 2020).

Here, the New York statute applies on its face to cocaine isomers to which the CSA does not. The statute under which Mr. Fernandez-Taveras was convicted fails the categorical analysis and is therefore not a removable offense under the INA. Accordingly, Mr. Fernandez-Taveras's underlying deportation was fundamentally unfair, in violation of Section 1326(d)(3).

### IV. CONCLUSION

For the foregoing reasons, Mr. Fernandez-Taveras's underlying deportation order is invalid and his Motion to Dismiss the Indictment (Dkt. 18) is GRANTED.

SO ORDERED.

Dated:   Brooklyn, New York
         January 7, 2021

                                    /s/ Nicholas G. Garaufis
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge